## Roberts *v.* Freeborn.

*(Common Pleas of New York City and County, General Term. May 18, 1888.)*

LANDLORD AND TENANT—FAILURE OF TENANT TO REPAIR—FINDING OF REFEREE.

In an action against the executrix of a deceased tenant for breach of an agreement to repair the leased premises, the only evidence as to the condition of the building at the beginning of the lease was his own general statement that it was good. The injury complained of was principally the rotting of wood-work, caused by refining sugar within the building; but how much of it was caused by defendant's intestate, and how much by the previous tenant, was not shown. Numerous witnesses testified that, while the building was in bad repair at the termination of the lease, it was as good as at the beginning. The referee allowed the whole bill for labor and material necessary to refit the building for use, while it was evident that some of the injury was caused by defacement of floors and walls by the fastening of machinery thereto by the previous tenant. *Held*, that the finding of the referee was not justified by the evidence.

Appeal from judgment on report of referee.

Action by Richard S. Roberts against Cora C. Freeborn, executrix of the last will and testament of ―――― Freeborn, on a covenant to repair leased premises. The judgment on the report of the referee was for plaintiff for the sum of $913.47, and defendant appealed.

Argued before LARREMORE, C. J., and BOOKSTAVER and ALLEN, JJ.

*W. S. Poor*, for appellant. *Goodrich, Deady & Platt*, for respondent.

LARREMORE, C. J. It is evident that the crucial question to be settled at the beginning of the trial in this action was, what was the condition of the premises in question at the time of the original letting thereof to defendant's intestate, on or about the 1st day of February, 1874? Plaintiff certainly could not claim that the lessee was bound to put them into any better condition than when he originally took them. · The lease required the defendant to restore the building to its original condition; and the determination of what this original condition was, must be the essential test by which to try any claim that the plaintiff may assert. The referee has found that the building was materially damaged during Mr. Freeborn's tenancy, and has reported in plaintiff's favor for what he estimates to be the amount of such damage. In

my opinion, the weight of evidence was strongly against such finding, and it is the duty of the court, even on appeal, to interfere with it, and reverse the judgment. The only evidence in the case tending to substantiate plaintiff's claim is his own, and that is of the most general character. He testifies that, when the lease was made to Freeborn, "the walls of the building were in perfect condition, and so was the floor. The windows and beams were also in perfect order." The plaintiff does not pretend to be an expert builder, and the only aid which the court has in determining what he intended to convey by the phrase "perfect condition" is his own definition at folio 43. "I mean by 'perfect condition' the condition in which the building was left at the time of the failure of the bankrupt firm of Breck & Schemerhorn. * * * When this lease was made, the premises were in the same condition as when left by Breck & Schemerhorn." The other witnesses called by plaintiff had never seen or examined the building, so far as the record shows, until long after the lease to Mr. Freeborn was made; so that, as above stated, the only testimony upon which plaintiff can rely as to the original condition of the building is his own bare assertion that the walls, floors, windows, and beams were in perfect order. To rebut this, a number of witnesses for the defendant testified directly that the premises were in substantially as good condition at the time of the surrender of the premises, in 1879, as they were when the lease was made, in 1874. They are corroborated by many facts, the truth of which the plaintiff would be obliged to concede. The premises had been occupied "since somewhere about 1860 or 1865" continuously as a sugar refinery. When Mr. Freeborn took the lease, in 1874, it was after a previous firm of sugar refiners had failed, and he continued such business; and, as it seems, though it is not expressly stated, acquired the machinery and fixtures already in the building which had been used by such insolvent firm. It appears by the testimony of both plaintiff's and defendant's witnesses that the general condition of the floors throughout the building, at the termination of Mr. Freeborn's tenancy, was rotten. One of plaintiff's expert witnesses testifies as follows: "The floors were in bad condition, and a great many of the beams were in bad condition, which made it necessary to take them out, especially in the South-Street side. Some of the beams were rotten, and some not quite strong enough; that is, they should have been taken out, and replaced by new ones; that is, I mean they were saturated by this stuff that comes out of barrels, and water-soaked." Damages occasioned by the rotting of floors are certainly not to be included among those on account of which a landlord may claim under the tenant's covenant to repair. Rotting is usually the work of time; and if, in the present instance, it was superinduced by "this stuff," being the overflow or drippings from the tanks and receptacles used in sugar refining, the presumption is, if there be any presumption about the matter in default of direct evidence, that more of such deterioration by rotting took place during the fourteen years of use as a sugar refinery, from 1860 to 1874, than during the five-years continuation of such use by Mr. Freeborn, from 1874 to 1879. In regard to certain openings and holes in the floors, made necessary for the insertion of machinery and the passage of belts, there can be no doubt that many, if not all, of the same existed at the time of the making of this lease. Defendant's witnesses who were acquainted with the building in 1874 are unanimous on this point; and the plaintiff himself admits it. Many of the implements of machinery were necessarily set into the floor, and screwed down and fastened there, and their removal would, in the nature of things, leave certain marks and defacements. There are other points that might be cited which additionally corroborate defendant's contention that the building was not in "perfect condition," in the absolute sense of that phrase, in 1874, and that it was then in very much the same state as when surrendered by defendant's intestate at the expiration of his lease. But enough has been said to show that plaintiff's bare, uncorroborated generaliza-

tion as to the condition of the premises at the time of the original letting should have been disregarded, because clearly against the weight of evidence.

It is also apparent that this fundamental error resulted in what would be a very serious practical injustice if this judgment were allowed to stand. The plaintiff testified that, after the defendant's intestate left the premises, he paid the sum of $913.47 for a carpenter's bill to put the premises into good and tenantable condition. He repudiates the idea that any of this money was expended in permanent alterations, and in converting the building from a sugar refinery into a warehouse. But, even on his own theory that this sum covered merely the cost of putting the building into an ordinary tenantable condition for general purposes, it is evident that the defendant is charged with a large amount in excess of what could possibly be his just liability. The referee allowed the carpenter's bill in its entirety, but this covered the whole price for labor and materials necessitated by the rotting of the floors and beams, and by the cutting up and defacement of floors on account of the insertion therein and attachment thereto of machinery and utensils of the refinery, which had been made long before Mr. Freeborn ever saw the premises. The effect of it would be to compel defendant to pay the whole cost of carpenter's work required to restore the building to the condition it was in in 1860, before it had ever been used as a sugar refinery. It is true that the carpenter himself testifies that this bill of his covered only the repairs made necessary by the damage to the building occurring during Mr. Freeborn's tenancy. This, besides being as general in its character as plaintiff's own testimony, is necessarily pure inference. I cannot see that such testimony has any other effect than to show bias on the part of the witness. He was not acquainted with the condition of the building at the time of the making of the lease in 1874, and therefore any opinion upon that subject which he expresses is founded on mere hearsay. As above shown, the entire carpenter's bill paid by the plaintiff has been allowed by the referee without any deduction; and there is no evidence in the case which would enable us, even if we were so disposed, to reduce the judgment. No facts are given tending to show how much of the damage to the floors and beams is attributable to the rotting thereof before Mr. Freeborn's tenancy began, and the defacements of the building by reason of its original fitting up as a sugar refinery, and how much of such damage can be properly held to have been occasioned during Mr. Freeborn's tenancy. This error, which is embodied in the seventh finding of fact of the referee's report, is in itself sufficient to necessitate a new trial. But on such trial it is to be desired that, in addition to requiring succinct and specific evidence of the state of the floors and beams at the beginning of Freeborn's tenancy, similar evidence be insisted upon as to the condition of the walls at the same time. The only testimony on this point on the present trial was that of the plaintiff himself, and consisted of the same vague and general statements which he gave in regard to the floors. At least two of the defendant's witnesses testified that the east wall of the building was, in 1874, warped, out of plumb, and in a dangerous condition. Plaintiff's witnesses testified that in 1879, at the termination of this lease, the building was in such a condition that they were afraid it would be condemned if brought to the notice of the inspector of buildings. There is nothing in the case to show that this dangerous condition of the east wall had been produced since the commencement of Freeborn's tenancy, except the statements of the plaintiff above alluded to. In my judgment, the weight of evidence on this point is almost as clearly against plaintiff's contention as on the other, in regard to the floors and beams. The judgment should be reversed, and a new trial ordered, with costs to abide the event.

ALLEN and BOOKSTAVER, JJ., concur.